STATE OF NORTH CAROLINA v. LAMONT CLAXTON UNDERWOOD

No. COA98-648

(Filed 17 August 1999)

### 1. Evidence— other crimes—common scheme—homicide

In a prosecution for the kidnapping and first-degree murder of a rival for a girlfriend, there was no abuse of discretion in the admission of evidence of the murder of the girlfriend's mother where the State used the evidence to show that defendant had a common scheme to hurt the girlfriend, there was substantial evidence from which a jury could conclude that defendant killed the mother, and the evidence clearly shows several significant similarities.

### 2. Evidence— other crimes—no chilling effect on testimony

The admission of evidence of a second murder in a first-degree murder prosecution did not impermissibly discourage defendant from testifying where defendant's decision not to testify was purely tactical and not constitutional.

### 3. Criminal Law— instructions—requested—incorrect statement of law

There was no error in a first-degree murder and kidnapping prosecution in the denial of defendant's requested instruction on the limited use of evidence concerning another murder where the tendered instruction would have incorrectly stated the law.

### 4. Witnesses— expert—mtDNA analyst

The trial court in a murder and kidnapping prosecution did not err by accepting as an expert in the field of mtDNA analysis the chief of an FBI DNA analysis unit. Although defendant argued that the testimony was of no assistance to the jury, the mtDNA evidence was relevant to show that it was more probable that a hair found in defendant's automobile trunk was the victim's.

### 5. Evidence— scientific testing—standard for admissibility

The following factors should be considered in determining whether scientific evidence is reliable: whether the theory or technique can be or has been tested, whether the theory has been subjected to peer review and publication, whether the theory has been submitted to the scrutiny of the scientific community, the known or potential rate of error, and the general acceptance in a

relevant scientific community. North Carolina emphasizes the reliability of the scientific method and not its popularity within a scientific community.

### 6. Evidence— mtDNA testing—admissible

Testing of mtDNA is sufficiently reliable to warrant admission into evidence.

### 7. Homicide; Kidnapping— sufficiency of evidence

There was substantial evidence to support the reasonable inference that the victim was kidnapped and murdered by defendant.

Appeal by defendant from judgment entered 25 July 1997 by Judge Forrest A. Ferrell in Watauga County Superior Court. Heard in the Court of Appeals 24 February 1999.

*Attorney General Michael F. Easley, by Special Deputy Attorney General Ronald M. Marquette, for the State.*

*David Y. Bingham and Thomas M. King for defendant-appellant.*

TIMMONS-GOODSON, Judge.

Defendant appeals from the judgment entered upon his convictions of first-degree murder and first-degree kidnapping in violation of North Carolina General Statutes sections 14-17 and 14-39. He seeks a new trial based on his contention that the trial court committed prejudicial error by: (1) admitting evidence of the murder of Catherine Miller, (2) denying defendant's requested instruction to the jury, (3) admitting expert testimony regarding mitochondrial DNA ("mtDNA") testing and (4) refusing to dismiss the charges at the close of the State's evidence.

The State's evidence at trial tended to show that on 7 January 1994, the body of Viktor Gunnarsson ("Gunnarsson") was found near Deep Gap, North Carolina by a North Carolina Department of Transportation employee. The body was located about 300 feet from a ramp to the Blue Ridge Parkway in Watauga County. Gunnarsson had been dead for weeks and the cause of death, as determined by the Chief Medical Examiner, was a gunshot wound to the head. Two .22 caliber bullets were removed from Gunnarsson's head and the contents of his stomach revealed partially digested potatoes, sug-

gesting that he died within a few hours of eating. Gunnarsson had not been seen since 3 December 1993, when he had dinner with Kay Weden ("Weden"), a former girlfriend of defendant. As a part of Gunnarsson's dinner he had eaten potatoes.

Weden had ended a relationship with defendant in December of 1993. During her relationship with defendant, she received several anonymous threatening letters. One such letter stated that a .22 caliber bullet had been fired into her house. A deputy sheriff later found a .22 caliber bullet lodged in the exterior of her home near her son's bedroom.

Defendant was employed in December of 1993 at Salisbury High School as a Salisbury police officer. An examination of the typewriters at the school revealed that the same typewriter ribbon had been used to type Weden's address and a letter that had been sent to her.

Defendant possessed a .22 caliber pistol and rifle, and was issued a Colt .38 revolver while serving as deputy sheriff in Lincoln County. The inventory records at the Lincoln Police Department showed that the gun had been turned in but the actual weapon was never located. Several witnesses testified that they had seen defendant in possession of a .38 caliber weapon just prior to the December murders.

On the night of 3 December 1993, Gunnarsson's car was parked at the Weden residence. Defendant drove by Weden's house and saw Gunnarsson's car. Shirley Scott, a woman in the car with defendant, testified that they drove by Weden's house twice that night. Jason Weden, Weden's son, testified that he saw defendant drive by the house around 11:00 p.m. Defendant called his friend, Rick Hillard, at 11:30 p.m. and gave him a license plate number and asked him to perform a check on the license plate number. Defendant received a call shortly thereafter during which Scott heard Hillard say, "Viktor Gunnarsson." The license plate number was for a vehicle registered to Gunnarsson. His address was listed in the Salisbury phone directory.

In December 1993 or January 1994, defendant took his 1979 Monte Carlo to a car wash and had it thoroughly cleaned, including having the trunk carpet shampooed. When police searched the car on 1 February 1994, scratches were observed inside the trunk compartment and a mark that resembled a footprint was seen on the under-

side of the trunk lid. The trunk mat was removed from the car. Mitochondrial DNA and microscopic sequences were taken from hairs found on the trunk mat of defendant's car.

On 6 December 1993, defendant visited a restaurant where he knew that Weden would be dining with her mother, Catherine Miller ("Miller"), and friends. Defendant stated to Weden that Miller had ruined their relationship and that he wished something would happen to Miller so Weden would know how he felt.

On 9 December 1993, the body of Miller was found in her home. She had been shot twice in the head with .38 caliber bullets. The .38 caliber bullets that were taken from Miller's body were consistent with having been fired by a Colt .38 Detective Special.

Troy Hamlin ("Agent Hamlin") and Dr. Joseph A. DiZinno ("Dr. DiZinno") were two of the witnesses qualified by the court as experts. Agent Hamlin, special agent with the North Carolina State Bureau of Investigation, testified as an expert in the field of hair examination and comparison. After conducting a microscopic examination and comparison of the known hair samples of Gunnarsson and the hairs found on defendant's trunk mat, Agent Hamlin testified that the hairs were microscopically consistent and could have originated from Gunnarsson.

Dr. DiZinno, an employee of the Federal Bureau of Investigation, was qualified as an expert in the field of hair examination and mtDNA analysis. Dr. DiZinno has training in microscopic hair examination and has performed mtDNA research and analysis. He is the chief of DNA analysis unit number 2 where mtDNA tests are conducted. He performed a DNA sequencing from one of the hairs located on defendant's trunk mat and compared it to the mtDNA sequence obtained from a known blood sample of Gunnarsson. Dr. DiZinno opined that the DNA sequence from the hair and the DNA sequence from the blood sample were identical. He concluded that Gunnarsson could not be excluded as a source of the hairs from defendant's trunk mat.

I.

[1] The first question on appeal is whether the trial court erred by admitting evidence of Miller's homicide as evidence in the homicide of Gunnarsson in violation of Rule 404(b) of the North Carolina Rules of Evidence.

STATE v. UNDERWOOD

[134 N.C. App. 533 (1999)]

Rule 404(b) of the North Carolina Rules of Evidence provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, entrapment or accident.

N.C. Gen. Stat. § 8C-1, Rule 404(b) (1992). The landmark case in interpreting and applying Rule 404(b) is *State v. Stager*, 329 N.C. 278, 406 S.E.2d 876 (1991), where the Supreme Court upheld the admissibility of evidence of the death of the defendant's first husband in her trial for the murder of her second husband ten years later under similar circumstances. The Court ruled that evidence of other crimes is admissible if there is "substantial evidence tending to support a reasonable finding by the jury that the defendant committed a similar act or crime and its probative value is not limited solely to tending to establish the defendant's propensity to commit a crime such as the crime charged." *Id.* at 303-04, 406 S.E.2d at 890. The Court further held that Rule 404(b) is a general rule of inclusion of relevant evidence of other crimes with the exception that the evidence must be excluded if its probative value is to show that defendant had the propensity or disposition to commit an offense of the nature of the crime charged. *Id.* at 302-03, 406 S.E.2d at 890 (citations omitted). Other crimes may be offered to determine the issue of defendant's identity as the perpetrator when the circumstances of the two crimes "tend to show the crime charged and another offense were committed by the same person." *State v. Moore*, 309 N.C. 102, 106, 305 S.E.2d 542, 545 (1983) (quoting *State v. McClain*, 240 N.C. 171, 175, 81 S.E.2d 364, 367 (1954)). The " 'acid test' for whether evidence of other distinct crimes properly falls within the identity provision in Rule 404(b) and its common law precursor 'is its logical relevancy to the particular excepted purpose or purposes for which it is sought to be introduced.' " *State v. Jeter*, 326 N.C. 457, 461, 389 S.E.2d 805, 808 (1990) (quoting *McClain*, 240 N.C. at 177, 81 S.E.2d at 368).

In the case at bar, the State used the evidence of Miller's death to show that defendant had a common scheme to hurt Weden for her refusal to continue their relationship. To carry out this scheme, he killed Gunnarsson, a man Weden dated, and Miller, Weden's mother.

Under Rule 404(b), there must be substantial evidence from which the jury could reasonably infer that defendant committed the

**STATE v. UNDERWOOD**

[134 N.C. App. 533 (1999)]

murder of the victim. *Stager*, 329 N.C. at 303, 406 S.E.2d at 890. Taking the facts in the light most favorable to the State, the evidence tends to show the following: The body of Miller was found on 9 December 1993 in her residence. She had been shot with a .38 Colt revolver similar to the one issued to defendant by the Lincoln County Sheriff's Department. Several witnesses testified that defendant had such a weapon in his possession as late as November of 1993. In fact, defendant gave the weapon to Rex Keller, Jr. ("Keller"), for the purpose of assaulting or scaring Weden. Keller returned the gun to defendant. Defendant had publicly blamed Miller for many of the problems he had with Weden. Prior to Weden breaking up with defendant on 8 December 1993, defendant wrote her a lengthy letter in which he twice warned her not to "force me into anything." We conclude that there was substantial evidence in which a jury could have concluded that defendant killed Miller.

Defendant argues that any evidence of the Miller homicide was inadmissible because the facts and circumstances of the Miller and Gunnarsson killings were not similar in nature. We disagree.

In *State v. Scott*, 318 N.C. 237, 248, 347 S.E.2d 414, 420 (1986), our Supreme Court held that the incidents must be sufficiently similar and not so remote in time as to be more probative than prejudicial. The similarities between the instances need not rise to the level of the unique and bizarre but simply "must tend to support a reasonable inference that the same person committed both the earlier and later acts." *Stager*, 329 N.C. at 304, 406 S.E.2d at 891. While there are some differences, the evidence clearly shows several significant similarities. Both victims were shot twice in the head, both shootings took place between the 3rd and 9th of December, and both victims were closely connected to Weden who had recently broken up with defendant. With this circumstantial evidence, a jury could reasonably infer that defendant killed Miller.

Defendant argues that the prejudicial effect of the Miller homicide substantially outweighed its probative value to the jury. Whether or not to exclude evidence under Rule 403 is within the discretion of the trial court and will not be overturned absent an abuse of discretion. *State v. Hennis*, 323 N.C. 279, 285, 372 S.E.2d 523, 527 (1988). Where the trial court has discretion and fails to exercise it, defendant is entitled to a new trial. *State v. Cotton*, 318 N.C. 663, 668, 351 S.E.2d 277, 280 (1987). In the instant case, the trial court conducted a lengthy pretrial hearing, made 53 findings of fact and made conclu-

sions of law supporting its decision to admit the evidence. Defendant offered no evidence. The similarities between the killings of Miller and Gunnarsson were highly probative on the issue of identity. We are aware of the propensity of unfair prejudice to defendant in the introduction of evidence of crimes separate from that for which he is being tried; however, we find no abuse of discretion by the trial court in failing to exclude this evidence.

**[2]** Defendant argues that the admittance of evidence regarding Miller's homicide had a chilling effect on his right to testify in his own defense. The evidence of the killing of Miller had been ruled admissible pursuant to Rule 404(b) prior to the trial. Defendant relies on *State v. Lamb*, 321 N.C. 633, 365 S.E.2d 600 (1988), where the Court held that the trial court erred in denying defendant's motion in limine to exclude evidence implicating defendant on other killings on the basis that the introduction of the evidence impermissibly "chilled" her right to testify in her own defense. However, in this case, the evidence had been ruled admissible prior to trial, thus defendant's decision not to testify was purely tactical, not constitutional. Furthermore, in *State v. White*, 340 N.C. 264, 288, 457 S.E.2d 841, 855 (1995), the Court held that because there was no threat that inadmissible evidence would be used to cross-examine defendant, he was not impermissibly discouraged from testifying at trial. Therefore, we hold that the admission of evidence of Miller's murder did not "chill" defendant from testifying. This argument is overruled.

II.

**[3]** Defendant next argues that the trial court erred in denying defendant's requested instruction on the limited use of the evidence of the murder of Miller. Once again, we disagree.

A trial court must, upon request, instruct the jury that the evidence is to be considered only for the purpose for which it was admitted. *State v. Haskins*, 104 N.C. App. 675, 411 S.E.2d 376 (1991), *disc. review denied*, 331 N.C. 287, 417 S.E.2d 256 (1992). Defendant requested a jury instruction stating that the jury could consider the Miller killing as evidence of motive for the Gunnarsson killing only if "the State proves this evidence beyond a reasonable doubt." In *Haskins*, the court ruled that Rule 404(b) evidence is properly considered when the jury can conclude "by a preponderance of the evidence" that the extrinsic act was committed by the defendant. *Id.* at 679, 411 S.E.2d at 380. The jury instruction tendered by defendant would have incorrectly stated the law, consequently, the court

refused to instruct the jury as defendant requested. The law does not require that the trial court's charge be given exactly in the words of the tendered request for instruction. *State v. Avery*, 315 N.C. 1, 33, 337 S.E.2d 786, 804 (1985). The trial court is only required to give requested instructions when they are a correct statement of the law. *Id.* The trial court instructed as follows:

> Evidence has been received tending to show the alleged commission of wrongs, crimes, or other acts concerning Jason Weden, Kay Weden, and Catherine Miller by the defendant which occurred before and after the death of Viktor Gunnarsson. You are not to consider evidence of such alleged wrongs, crimes, or acts as evidence of the defendant's character or evidence that in the crimes charged he acted in conformity with such character. Rather, this evidence was received solely for the purpose of showing the following, if it does so: the identity of the person who committed the crimes charged in the case; that the defendant had a motive for the commission of the crimes charged; that the defendant had the intent, which is a necessary element of the crimes charged; that there existed in the mind of the defendant a plan, scheme, system or design involving the crimes charged; or that the defendant had the opportunity to commit the crimes charged. If you believe this evidence, you may consider it, but only for the limited purpose for which it was received.

The trial court's instruction to the jury was proper and in accordance with the law. We find no error.

### III.

Defendant next argues that the court erred in admitting expert testimony concerning mtDNA evidence. Specifically, defendant argues that mtDNA testing is not scientifically reliable and its reasoning and methodology were not properly applied to the facts of this case. We disagree.

The admissibility of mtDNA evidence is an issue of first impression in North Carolina's appellate courts. In addressing defendant's argument, it is helpful to briefly review the process of mtDNA analysis. In simplistic terms, mitochondria are microscopic particles found in the cell, but outside the nucleus. NATIONAL RESEARCH COUNCIL, THE EVALUATION OF FORENSIC DNA EVIDENCE 72 (1996). Mitochondrial DNA analysis is a method of DNA testing which was implemented for

forensic purposes by the Federal Bureau of Investigation laboratory in June of 1996. It is based on the Polymerase Chain Reaction ("PCR") method of DNA analysis. The mtDNA is inherited solely from the mother and is the same for all maternal relatives. *Id.* Mitochondrial DNA testing is performed by extracting the DNA from the mitochondria. The DNA is then amplified and examined to determine its sequences of A's, G's, T's, and C's. The sequence is then compared to another sequence donated by a known person. If the sequences are identical, the examiner compares the sequence to the available database of mtDNA sequences to determine if he has ever seen that same sequence. The statistic will be based upon the frequency of similar DNA patterns occurring within the database and within each group in the database. The final result simply either excludes the tested individual as the sample donor or confirms that such individual is within a certain percentage of the population which could have donated the sample.

**[4]** Rule 702 of the North Carolina Rules of Evidence establishes the following standard for the admissibility of expert testimony:

If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion.

N.C. Gen. Stat. § 8C-1, Rule 702 (1992). "The essential question in determining the admissibility of opinion evidence is whether the witness, through study or experience, has acquired such skill that he is better qualified than the jury to form an opinion on the subject matter to which his testimony applies." *State v. Mitchell*, 283 N.C. 462, 467, 196 S.E.2d 736, 739 (1973). Ordinarily, whether a witness qualifies as an expert is exclusively within the discretion of the trial judge and is not to be reversed absent a complete lack of evidence to support his ruling. *State v. Bullard*, 312 N.C. 129, 140, 322 S.E.2d 370, 376 (1984). In the case at bar, Dr. DiZinno testified as an expert in mtDNA analysis in order to establish whether the hairs found in the trunk of defendant's car could have been those of Gunnarsson. Dr. DiZinno testified that as the chief of the FBI's DNA analysis unit number 2, he earned a Bachelor of Science degree from the University of Notre Dame and a Doctor of Dental Surgery from Ohio State. He further testified that he was an expert hair examiner with two years experience in conducting mtDNA analysis. He had previously testified in court

and given his opinion as an expert witness in mtDNA. The evidence shows that Dr. DiZinno was properly accepted by the trial court as an expert in the field of mtDNA analysis and, therefore, better qualified than the jury to form an opinion on the hairs taken from defendant's trunk.

Defendant argues that the expert testimony is of no assistance to the jury. This argument is rejected. The source of hair found in defendant's trunk was a crucial fact in this case. Mitochondrial DNA evidence was offered to show that the hair could have been Gunnarsson's. According to Rule 401, evidence is relevant if it has a tendency to make a fact of consequence "more probable or less probable than it would be without the evidence." N.C. Gen. Stat. § 8C-1, Rule 401 (1992). Therefore, even though the expert testimony was unable to definitively eliminate the possibility that the hair came from someone else, the mtDNA was relevant to show that it was more probable that the hair belonged to Gunnarsson.

[5] Defendant argues that mtDNA evidence is scientifically unreliable. In North Carolina, a new scientific method is admissible at trial if it is scientifically reliable. *Bullard*, 312 N.C. at 148, 322 S.E.2d at 381 (citations omitted). In determining admissibility for new scientific evidence and scientific reliability, North Carolina does not adhere exclusively to the *Frye* standard which emphasizes a general acceptance in the particular field in which it belongs. *Id.* at 147, 322 S.E.2d at 380; *see Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923). Instead, we adopted factors similar to those of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), for determining scientific validity. In *Daubert*, the United States Supreme Court held that the following factors should be considered in determining whether scientific evidence is reliable: (1) whether the theory or technique can be or has been tested, (2) whether the theory has been subjected to peer review and publication, (3) whether the theory has been submitted to the scrutiny of the scientific community, (4) the known or potential rate of error, and (5) the general acceptance in a relevant scientific community. *Id.* North Carolina emphasizes the "reliability of the scientific method and not its popularity within a scientific community." 1 Brandis & Broun on North Carolina Evidence § 113 (5th ed. 1998). "[W]hen no specific precedent exists, scientifically accepted reliability justifies admission of the testimony . . . and such reliability may be found either by judicial notice or from the testimony of scientists who are expert in the subject matter, or a combination of the two." *Bullard*, 312 N.C. at 148,

322 S.E.2d at 381 (quoting 1 Brandis on North Carolina Evidence § 86 (2nd ed. 1982). Once a determination of scientific reliability and validity has been established, the next question is whether it is also relevant. Relevant evidence is admissible if it "has any logical tendency however slight to prove the fact at issue in the case." *State v. Pratt*, 306 N.C. 673, 678, 295 S.E.2d 462, 466 (1982). Relevant evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice or a confusion of the issues. N.C. Gen. Stat. § 8C-1, Rule 403 (1992).

**[6]** In the case *sub judice*, Dr. DiZinno testified that he compared DNA sequence from Gunnarsson's blood and a DNA sequence from the hair found in the trunk mat of defendant's vehicle. He found the sequences to be the same so that Gunnarsson could not be excluded as a possible source of the hair. In the database relied upon by Dr. DiZinno, he testified that he had seen the same DNA sequence about one out of ten times. Dr. DiZinno opined that although possible, it is "highly unlikely" that two people would match in both a microscopic examination of hair and a mtDNA sequence.

Defendant further argues that the problem with mtDNA testing is that the population database with which DNA samples are compared consisting of over 1,000 people worldwide, is too small to draw any meaningful conclusions about the significance of a match. By contrast, the population database for nuclear or conventional DNA testing contains millions of samples that can be compared.

There has been over four years of solid research, testing and publications in peer-reviewed scientific journals on mtDNA analysis. *State v. Council*, 335 S.C. 1, 515 S.E.2d 508 (1999). The mtDNA analysis provides results when genomic DNA analysis of hair shafts or any other biological specimen known to contain little or no DNA does not. Moreover, it has been widely accepted in evolutionary genetic studies and has been used in at least six other states.

In addressing the jury, Dr. DiZinno told the jury that mtDNA testing does not give proof of identification as conventional DNA testing does. In *State v. Catoe*, 78 N.C. App. 167, 169, 336 S.E.2d 691, 692 (1985), *cert. denied*, 316 N.C. 380, 344 S.E.2d 1 (1986), this Court stated that while the scientific technique on which an expert bases a proffered opinion must be recognized as reliable, "absolute certainty of result is not required." We hold that mtDNA testing is sufficiently reliable to warrant its admissibility into evidence.

We find support in another jurisdiction for our holding regarding the admissibility of mtDNA. *Council*, 335 S.C. 1, 515 S.E.2d 508. In *Council*, the South Carolina Supreme Court upheld the admission of mtDNA evidence, because the evidence was of assistance to the jury. The Court observed that mtDNA evidence provided an objective confirmation of the subjective microscopical comparison performed on the hairs. *Id.* The Court concluded that the trial judge was within his discretion in admitting the mtDNA analysis because the evidence was of assistance to the jury, the expert witness was qualified, and the underlying science was reliable.

In conclusion, the trial court did not err in admitting expert testimony concerning mtDNA linking defendant to the murder of Gunnarsson.

IV.

**[7]** Finally, defendant argues that the trial court erred in failing to dismiss all charges against defendant at the close of the State's evidence on the ground that the evidence was insufficient as a matter of law to sustain a conviction. We disagree.

In ruling upon a motion to dismiss, the standard is whether there is substantial evidence (1) of each essential element of the offense alleged and (2) of defendant being the perpetrator of the offense. *State v. Powell*, 299 N.C. 95, 98, 261 S.E.2d 114, 117 (1980). If, upon defendant's motion to dismiss, evidence is sufficient only to raise a suspicion or conjecture as to either the commission of the offense or the identity of the perpetrator, the motion should be allowed. *Id.* In ruling on the defendant's motion to dismiss, the evidence is to be considered in the light most favorable to the State, and the State is entitled to every reasonable inference to be drawn therefrom. *Id.* at 99, 261 S.E.2d at 117. The test for sufficiency of evidence is the same whether the evidence is circumstantial, direct, or both. *State v. Cutler*, 271 N.C. 379, 383, 156 S.E.2d 679, 682 (1967).

Applying the foregoing principles of law to the convictions for first-degree murder and first-degree kidnapping, one is guilty of first-degree murder if he kills another human being with malice and with premeditation and deliberation. N.C. Gen. Stat. § 14-17 (1993). One is guilty of first-degree kidnapping if he unlawfully confines, restrains or removes a person against their will for a felonious purpose and seriously injures or sexually assaults the person. N.C. Gen. Stat. § 14-39 (1993).

**STATE v. UNDERWOOD**

[134 N.C. App. 533 (1999)]

The evidence when viewed in a light most favorable to the State established the following concerning the death of Gunnarsson: Gunnarsson was last seen alive when he left the house of Weden on 3 December 1993, at approximately 11:30 p.m. Earlier that night Gunnarsson and Weden visited a seafood restaurant where Gunnarsson had eaten a meal of seafood and potatoes. When his body was found, Gunnarsson had been dead for weeks and was killed by a .22 caliber bullet wound to the head. Defendant had possession of a .22 caliber weapon. The medical examiner found small traces of potato skins in Gunnarsson's stomach and opined that Gunnarsson received a fatal gunshot wound within a few hours after eating his meal.

Defendant was extraordinarily jealous when it came to Weden and very angry at her refusal to resume a relationship with him. On the 3rd of December, defendant learned that a car parked outside Weden's house that night was registered to Gunnarsson, whose address was listed in the Salisbury directory. Within a matter of days, defendant denied having ever heard Gunnarsson's name.

After Gunnarsson disappeared, defendant had his car cleaned and trunk mat shampooed at a car wash. He later painted the trunk's interior to hide small scratch marks and a faint footprint. Despite the cleaning, several hairs were found embedded in the trunk mat. The hairs matched those of Gunnarsson when examined by mtDNA analysis. Any person in Gunnarsson's maternal blood line would have the same mtDNA sequence; however, Gunnarsson's family lives in Sweden. These facts provide substantial evidence to support the reasonable inference that Gunnarsson was kidnapped and murdered by defendant.

For the aforementioned reasons, we conclude that there was substantial evidence to support findings that the offenses charged were committed by defendant. Therefore, the motion was properly denied.

## CONCLUSION

Accordingly, we conclude that defendant has received a fair trial, free from prejudicial error.

No error.

Judges MARTIN and HUNTER concur.