**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 10-6077**

LAMONT CLAXTON UNDERWOOD,

                    Petitioner - Appellee,

          v.

SID HARKLEROAD,

                    Respondent - Appellant.

Appeal from the United States District Court for the Western District of North Carolina, at Statesville. Graham C. Mullen, Senior District Judge. (5:04-cv-00193-GCM)

Argued: September 21, 2010          Decided: January 12, 2011

Before TRAXLER, Chief Judge, HAMILTON, Senior Circuit Judge, and Mark S. DAVIS, United States District Judge for the Eastern District of Virginia, sitting by designation.

Reversed by unpublished per curiam opinion.

**ARGUED:** Clarence Joe DelForge, III, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellant. Milton Gordon Widenhouse, Jr., RUDOLF, WIDENHOUSE & FIALKO, Chapel Hill, North Carolina, for Appellee. **ON BRIEF:** Roy Cooper, Attorney General of the State of North Carolina, Raleigh, North Carolina, for Appellant.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Following a jury trial, Lamont Claxton Underwood (Underwood) of Salisbury, North Carolina was convicted in the Superior Court, Watauga County, North Carolina of the first-degree murder and first-degree kidnapping of a man who dated his former fiancée. Underwood was sentenced to a term of life imprisonment on the first-degree murder conviction and a consecutive sentence of forty years on the first-degree kidnapping conviction. After unsuccessfully challenging his convictions on direct appeal and in state habeas proceedings, Underwood filed an application for a writ of habeas corpus in the United States District Court for the Western District of North Carolina, pursuant to 28 U.S.C. § 2254.[1] On December 23, 2009, the district court granted Underwood a conditional writ of habeas corpus, such that if the state court did not grant Underwood a new trial within 180 days, Underwood had to be set free. The State noted a timely appeal and moved for a stay of the district court's judgment in its entirety pending resolution of this appeal. The district court granted the State's motion for a stay.

---

[1] Underwood named Sidney Harkleroad, Administrator of the Marion Correctional Institution in Marion, North Carolina, as Respondent. For ease of reference, we refer to Respondent as "the State" throughout this opinion.

For reasons that follow, we reverse the judgment of the district court.

I

On January 30, 1996, a Watauga County, North Carolina grand jury indicted Underwood for the first-degree kidnapping and first-degree murder of Viktor Gunnarsson. Underwood pled not guilty and proceeded to a jury trial, where he was represented by attorneys Bruce Kaplan (Defense Counsel Kaplan) and Chester Whittle, Jr. (Defense Counsel Whittle).[2]

The State's theory of the case was that Underwood, a former law enforcement officer, was a jealous, jilted lover, who killed Gunnarsson because he saw him as a romantic rival for the affections of Kay Weden (Weden), Underwood's former fiancée. Underwood, Weden, and Gunnarsson all lived in Salisbury, North Carolina.[3] The State theorized that Underwood had refused to accept Weden's decision to break up with him; that he had stalked, spied on, and harassed Weden and her teenage son Jason Weden; that Gunnarsson had begun to date Weden shortly before his murder; and that, upon learning that Weden was dating

_____

[2] At times, for ease of reference, when referring to Defense Counsel Kaplan and Defense Counsel Whittle collectively, we will refer to them as "Defense Counsel."

[3] Salisbury is in Rowan County.

Gunnarsson, Underwood kidnapped Gunnarsson from his apartment, took him in the trunk of his 1979 Monte Carlo to a secluded area approximately 109 miles away along the Blue Ridge Parkway in Watauga County, where Underwood shot and killed Gunnarsson with a .22 caliber rifle. In addition, the State theorized that approximately three days later, Underwood also shot and killed Weden's mother, Catherine Miller (Miller), also of Salisbury, because Miller had not been supportive of Weden's relationship with him. The indictment, however, only pertained to the first-degree kidnapping and first-degree murder of Gunnarsson.

The North Carolina Court of Appeals summarized the evidence from Underwood's jury trial as follows:

> The State's evidence at trial tended to show that on 7 January 1994, the body of Viktor Gunnarsson ("Gunnarsson") was found near Deep Gap, North Carolina by a North Carolina Department of Transportation employee. The body was located about 300 feet from a ramp to the Blue Ridge Parkway in Watauga County. Gunnarsson had been dead for weeks and the cause of death, as determined by the Chief Medical Examiner, was a gunshot wound to the head. Two .22 caliber bullets were removed from Gunnarsson's head and the contents of his stomach revealed partially digested potatoes, suggesting that he died within [four to five] hours of eating. Gunnarsson had not been seen since 3 December 1993, when he had dinner with Kay Weden ("Weden"), a former girlfriend of defendant. As a part of Gunnarsson's dinner he had eaten potatoes.
>
> Weden had ended a relationship with defendant in December of 1993. During her relationship with defendant, she received several anonymous threatening letters. One such letter stated that a .22 caliber bullet had been fired into her house. A deputy

- 4 -

sheriff later found a .22 caliber bullet lodged in the exterior of her home near her son's bedroom.

Defendant was employed in December of 1993 at Salisbury High School as a Salisbury police officer. An examination of the typewriters at the school revealed that the same typewriter ribbon had been used to type Weden's address and a letter that had been sent to her.

Defendant possessed a .22 caliber pistol and rifle, and was issued a Colt .38 revolver while serving as deputy sheriff in Lincoln County. The inventory records at the Lincoln Police Department showed that the gun had been turned in but the actual weapon was never located. Several witnesses testified that they had seen defendant in possession of a .38 caliber weapon just prior to the December murders.

On the night of 3 December 1993, Gunnarsson's car was parked at the Weden residence. Defendant drove by Weden's house and saw Gunnarsson's car. Shirley Scott, a woman in the car with defendant, testified that they drove by Weden's house twice that night. Jason Weden, Weden's son, testified that he saw defendant drive by the house around 11:00 p.m. Defendant called his friend, Rick Hillard, at 11:30 p.m. and gave him a license plate number and asked him to perform a check on the license plate number. Defendant received a call shortly thereafter during which Scott heard Hillard say, "Viktor Gunnarsson." The license plate number was for a vehicle registered to Gunnarsson. His address was listed in the Salisbury phone directory.

In December 1993 or January 1994, defendant took his 1979 Monte Carlo to a car wash and had it thoroughly cleaned, including having the trunk carpet shampooed. When police searched the car on 1 February 1994, scratches were observed inside the trunk compartment and a mark that resembled a footprint was seen on the underside of the trunk lid. The trunk mat was removed from the car. Mitochondrial DNA and microscopic sequences were taken from hairs found on the trunk mat of defendant's car.

On 6 December 1993, defendant visited a restaurant where he knew that Weden would be dining

with her mother, Catherine Miller ("Miller"), and friends. Defendant stated to Weden that Miller had ruined their relationship and that he wished something would happen to Miller so Weden would know how he felt.

On 9 December 1993, the body of Miller was found in her home. She had been shot twice in the head with .38 caliber bullets. The .38 caliber bullets that were taken from Miller's body were consistent with having been fired by a Colt .38 Detective Special.

Troy Hamlin ("Agent Hamlin") and Dr. Joseph A. DiZinno ("Dr. DiZinno") were two of the witnesses qualified by the court as experts. Agent Hamlin, special agent with the North Carolina State Bureau of Investigation, testified as an expert in the field of hair examination and comparison. After conducting a microscopic examination and comparison of the known hair samples of Gunnarsson and the hairs found on defendant's trunk mat, Agent Hamlin testified that the hairs were microscopically consistent and could have originated from Gunnarsson.

Dr. DiZinno, an employee of the Federal Bureau of Investigation, was qualified as an expert in the field of hair examination and mtDNA analysis. Dr. DiZinno has training in microscopic hair examination and has performed mtDNA research and analysis. He is the chief of DNA analysis unit number 2 where mtDNA tests are conducted. He performed a DNA sequencing from one of the hairs located on defendant's trunk mat and compared it to the mtDNA sequence obtained from a known blood sample of Gunnarsson. Dr. DiZinno opined that the DNA sequence from the hair and the DNA sequence from the blood sample were identical. He concluded that Gunnarsson could not be excluded as a source of the hairs from defendant's trunk mat.

State v. Underwood, 518 S.E.2d 231, 234-36 (N.C. Ct. App. 1999), cert. denied as improvidently granted, 535 S.E.2d 33 (N.C. 2000).

Of relevance to the issues on appeal, early in his opening statement for the defense, Defense Counsel Whittle told the jury:

> Now, as has been said to y'all while you were getting picked as jurors, this is a totally circumstantial case. There aren't any eyewitnesses to any event. But there is an eyewitness who supposedly saw someone after Mr. Gunnarsson's body was found out there in Deep Gap. Mr. LC Underwood was put in a line-up and the individual sat there and looked at him with six other guys: No, he isn't the person I saw.
>
> We have a confession by someone else who said he killed Mr. Underwood [sic]. We have someone who saw someone outside of Ms. Miller's house at the time of her murder, the Clerk of Court down there in Rowan County, and a composite sketch was made. It was not Mr. Underwood.

(J.A. 563). Next, in thirteen sentences, Defense Counsel Whittle briefly recounted Underwood's law enforcement career. At the conclusion of such recounting, Defense Counsel Whittle told the jury: "This is all stuff you'll hear from the witness stand." (J.A. 564). The following court day, the State filed motions in limine seeking (among other things) to bar defense counsel from eliciting testimony about a purported confession by a third party (Brandon Shelton) through the investigating officers. The State represented that Shelton "got drunk" and confessed to killing Gunnarsson, but later recanted the confession, and argued that defense counsel could only introduce evidence of the confession through Shelton during the

- 7 -

presentation of the defense's case. The trial court granted the State's motion.

The State took approximately three weeks to present its case. During the State's case, the defense drew out the substance of the promised line-up and composite drawing evidence during cross-examination of various witnesses, but was prevented by the judge's order from drawing out any evidence regarding the alleged third-party confession to Gunnarsson's murder. After the State rested, the defense rested without presenting any evidence which, under the North Carolina rules of criminal procedure, entitled the defense to make the final closing argument to the jury. The order of closing statements went defense-State-defense. During the defense's initial closing statement, no mention was made of: (1) the "eyewitness who supposedly saw someone after Mr. Gunnarsson's body was found out there in Deep Gap," and failed to pick Underwood out of a line-up; (2) the "confession by someone else who said he killed Mr. [Gunnarsson]"; or (3) the composite sketch of a person who did not resemble Underwood created from a description by the Clerk of Court for Rowan County of the person he saw "outside of Ms. Miller's house at the time of her murder . . . ." (J.A. 563).

At the beginning of the State's closing statement, over defense counsel's objection, the State highlighted the defense's failure to present any evidence regarding these three matters.

In closing rebuttal statement, Defense Counsel Kaplan and Defense Counsel Whittle each specifically addressed the line-up and composite drawing evidence referred to during the defense's opening statement by pointing out to the jury that the defense had drawn out the substance of such evidence during the defense's cross-examination of various State witnesses. And, although Defense Counsel never specifically addressed the confession issue during closing rebuttal statement, each reminded the jury during such statement that the defense need not present any evidence in the case, and Defense Counsel Kaplan explained that the defense decided not to present any evidence "because the State has not proven its case beyond a reasonable doubt." (J.A. 2767).

On July 21, 1997, the jury returned a unanimous verdict of guilty as to the first-degree kidnapping and the first-degree murder charges. Underwood was sentenced to life imprisonment plus forty years. Underwood filed a direct appeal making numerous claims of reversible error. In a published opinion, the North Carolina Court of Appeals rejected all such claims, holding that Underwood "received a fair trial, free from prejudicial error." State v. Underwood, 518 S.E.2d 231, 241

(N.C. Ct. App. 1999). The North Carolina Supreme Court ultimately denied Underwood's request for certiorari review. State v. Underwood, 535 S.E.2d 33 (N.C. 2000).

On October 4, 2001, Underwood filed a Motion for Appropriate Relief (MAR) in state court, pursuant to North Carolina General Statute § 15A-1415, arguing that he was subjected to ineffective assistance of counsel by virtue of numerous shortcomings of Defense Counsel, including "fail[ing] to call key witnesses regarding prior statements they had given and facts that were known about them that would have aided in [his] defense." (J.A. 255). Underwood complained in his MAR that, "During opening arguments, defense counsel, Chester Whittle told the jury we intended to call a person who was an eyewitness who had observed a person coming out of the wooded area at the approximate time the State claimed the victim was killed. **Unfortunately, this critical witness was not called on Defendant's behalf."** (J.A. 257). Underwood also complained that Defense Counsel was ineffective for failing to call various named witnesses, each of whom, according to Underwood, would have testified in support of his theory that a man named Brandon Shelton had truthfully confessed to Gunnarsson's murder. Notably, although Underwood alleged the content of the testimony these potential witnesses might have given at his trial had they been called by the defense, he failed to submit any evidence

- 10 -

whatsoever to the MAR court in support of this claim as required by North Carolina law. See N.C. Gen. Stat. § 15A-1420(b)(1) ("A motion for appropriate relief made after the entry of judgment must be supported by affidavit or other documentary evidence if based upon the existence or occurrence of facts which are not ascertainable from the records and any transcript of the case or which are not within the knowledge of the judge who hears the motion.").

To prevail on a claim of ineffective assistance of counsel, a defendant must show both that "counsel's representation fell below an objective standard of reasonableness," Strickland v. Washington, 466 U.S. 668, 688 (1984), and that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," id. at 694. The MAR court addressed and denied as without merit all of Underwood's claims of ineffective assistance of counsel in summary fashion and without a hearing. Ultimately, the MAR court denied Underwood's MAR in toto, and the North Carolina Court of Appeals denied Underwood's petition for certiorari.

Underwood then filed his application for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254. Notably, subsection (d) of § 2254 provides:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to

- 11 -

any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).[4]

Of relevance to the present appeal, Underwood claimed in his federal habeas petition that he was subjected to ineffective assistance of counsel solely by virtue of Defense Counsel Whittle having "promised" the jury in opening statement for the defense to present, but then Defense Counsel never presenting, exculpatory evidence regarding: (1) a line-up in which an eyewitness did not identify him as the man she saw coming out of the wooded area near where Gunnarsson's body was found; (2) a composite drawing of a man seen outside Miller's house at the time of her murder whom did not resemble him; and (3) a third-party confession to Gunnarsson's murder.[5] (J.A. 563).

---

[4] Although § 2254 refers to a habeas "application," we use the word "petition" interchangeably with the word "application."

[5] Underwood attached to his supporting brief in favor of his federal habeas petition statements taken by law enforcement officers indicating that a man named Brandon Shelton told his wife, Heather Shelton, and his friend Robbie Smith that he killed Gunnarsson, because Gunnarsson had had an affair with his
(Continued)

- 12 -

The State filed a combined answer and motion for summary judgment. Because the MAR court rejected Underwood's ineffective assistance of counsel claims in summary fashion, the district court was obliged to conduct an independent examination of the record, but nonetheless apply § 2254(d)(1)'s deferential standard of review in deciding whether to grant Underwood a writ of habeas corpus. Bell v. Jarvis, 236 F.3d 149, 158 (4th Cir. 2000) (en banc). The district court acknowledged that Underwood did not present to the MAR court a sworn statement by Shannon Tedders, Robbie Smith, Brandon Shelton, nor Heather Shelton regarding the substance of any potential testimony they could have offered. The district court nonetheless held that it did not need to consider the content of any statements by these individuals "in order to determine whether defense counsel were ineffective in failing to fulfill their promise to present exculpatory evidence." (J.A. 3023).

Ultimately, the district court granted Underwood a conditional writ of habeas corpus, such that if the State did

---

wife, that Shannon Tedders could not identify Underwood as the man she saw leaving the woods near her home on the alleged date of Gunnarsson's murder, and that Terry Osborne saw a man near Catherine Miller's home on the day she was murdered who was not Underwood.

not retry Underwood in 180 days, Underwood had to be set free.[6] Although acknowledging that the evidence mentioned in opening statements may not have been actually exculpatory, and that Underwood had failed to present such evidence to the state MAR court, the district court held that defense counsels' mere "promise to present" such evidence and then failing to do so amounted to constitutionally deficient performance which prejudiced the defendant.  J.A. 3023.

The State thereafter noted this timely appeal.


II

"A district court's decision to grant habeas relief is reviewed de novo."  Frazer v. South Carolina, 430 F.3d 696, 703 (4th Cir. 2005).  Thus, we are, as was the district court, obliged to conduct an independent examination of the record, but nonetheless apply § 2254(d)'s deferential standard of review in deciding whether Underwood is entitled to habeas relief.  Bell, 236 F.3d at 158.  Underwood's current ineffective assistance of counsel claim is based upon representations made during the defense's opening statement to the jury that the jury would hear certain allegedly exculpating evidence, but then resting without calling any witnesses in such regard and not addressing the

---

[6] The district court stayed this order pending appeal.

- 14 -

omissions in its initial closing statement. On appeal, the State concedes that Underwood fairly presented the substance of this claim in his MAR, and thus, we are not faced with considering the merits of a procedural default defense. Thus, the overarching issue in the present appeal is whether the MAR court's denial of Underwood's current ineffective assistance of counsel claim constitutes a decision that was contrary to, or involved an unreasonable application of Strickland, 466 U.S. at 668, 28 U.S.C. § 2254(d)(1), or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C § 2254(d)(2). See Sharpe v. Bell, 593 F.3d 372, 382-84 (4th Cir. 2010) (analyzing ineffective assistance of counsel claim under § 2254's deferential standard).

As previously stated, to prevail on a claim of ineffective assistance of counsel under Strickland, a defendant must show both that "counsel's representation fell below an objective standard of reasonableness," id., 466 U.S. at 688, and that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," id. at 694. The first requirement is commonly known in the relevant jurisprudence as Strickland's deficient performance prong, while the second is commonly known in the relevant jurisprudence as Strickland's prejudice prong. See,

e.g., Wong v. Belmontes, 130 S. Ct. 383, 384 (2009). Having independently examined the record, we hold the MAR court's denial of Underwood's current ineffective assistance of counsel claim did not constitute a decision that was contrary to, or involved an unreasonable application of Strickland, nor was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C § 2254(d)(2).

A

With respect to the line-up evidence referred to during the defense's opening statement, Underwood cannot establish Strickland's deficient performance prong. First, Defense Counsel Kaplan elicited the substance of this evidence during his cross-examination of Watauga County Deputy Sheriff Paula Townsend, who was the lead investigator in the Watauga County case concerning the murder of Gunnarsson. During such cross-examination, Deputy Sheriff Townsend either admitted or directly stated that: (1) on or about January 11, 1994, she interviewed a person who lived in the vicinity of where Gunnarsson's body was found; (2) as a result of such interview, an order was obtained to have Underwood be part of a line-up; (3) the line-up included Underwood and five other men with similar physical characteristics to Underwood and who were identically dressed in slacks and a military green colored

- 16 -

jacket; (4) the men in the line-up were asked to wear a military green colored jacket, because the line-up witness had told her and other investigators that "the person she saw had a jacket that same color" and investigators "had seized jackets that same color from the defendant's residence," (J.A. 1571); (5) she was present during the line-up; (6) the men in the line-up were asked to look one way and then the other way for the witness's viewing; (7) the witness was given all the time she needed to look at the men in the line-up; and (8) the witness did not identify anyone in the line-up. The elicitation of this testimony on cross-examination was consistent with Defense Counsel Whittle's reference to the eyewitness near Deep Gap who failed to identify Underwood and one-hundred percent fulfilled Defense Counsel Whittle's promise during opening statement that the jury would "hear" about "all [this] stuff . . . from the witness stand." (J.A. 564). Second, during closing rebuttal statement, Defense Counsel Kaplan and Defense Counsel Whittle each specifically addressed the line-up evidence by pointing out to the jury that the defense had drawn out the substance of such evidence on cross-examination. Third, Defense Counsel Whittle and Defense Counsel Kaplan each reminded the jury during such statement that the defense need not present any evidence in the case, and Defense Counsel Kaplan explained that the defense decided not to present any evidence "because the State has not

- 17 -

proven its case beyond a reasonable doubt." (J.A. 2767). In light of all these circumstances, Defense Counsel's handling of the promised line-up evidence did not fall outside the wide range of professionally competent assistance, and thus, Strickland's deficient performance prong is not met. 466 U.S. at 690.

B

With respect to the composite drawing evidence promised during the defense's opening statement, Underwood cannot establish Strickland's deficient performance prong. First, Defense Counsel Whittle elicited the substance of such evidence during his cross-examination of North Carolina State Bureau of Investigation Special Agent Don Gale and Rowan County Deputy Sheriff Terry Anger. Special Agent Gale assisted the Rowan County Sheriff's Department with its investigation into the murders of Miller and Gunnarsson. During cross-examination, Special Agent Gale either admitted or directly stated that: (1) a composite drawing was made in connection with the Miller case; (2) Terry Osborne provided the information for the composite drawing; (3) at the time Terry Osborne provided such information, he was a high school teacher; (4) by the time of Underwood's trial, Terry Osborne was the Clerk of Court for Rowan County; (5) the composite drawing was determined by the investigators to be someone who they "were considering a witness

- 18 -

at that time or a potential witness at that time,"; and (6) to his knowledge, Terry Osborne never identified Underwood as the person in the composite drawing. (J.A. 2107). Deputy Sheriff Anger was the lead investigator for the Rowan County Sheriff's Department concerning the murders of Miller and Gunnarsson. During cross-examination, Deputy Sheriff Anger either admitted or stated that a composite drawing was made to locate a potential witness in connection with Miller's murder and the person in the composite was never identified. As was the case with the line-up evidence, these elicitations on cross-examination one-hundred percent fulfilled Defense Counsel Whittle's promise during opening statement that the jury would "hear" about "all [this] stuff . . . from the witness stand." (J.A. 564). Second, Defense Counsel Kaplan and Defense Counsel Whittle each specifically addressed the composite drawing evidence during the defense's closing rebuttal statement by pointing out to the jury that the defense had drawn out the substance of such evidence on cross-examination. Third, Defense Counsel Whittle and Defense Counsel Kaplan each reminded the jury during such statement that the defense need not present any evidence in the case, and Defense Counsel Kaplan explained that the defense decided not to present any evidence "because the State has not proven its case beyond a reasonable doubt." (J.A. 2767). As was the case with the line-up evidence, in light of

all these circumstances, Defense Counsel's handling of the composite drawing evidence did not fall outside the wide range of professionally competent assistance, and thus, Strickland's deficient performance prong is not met.  466 U.S. at 690.

C

Lastly, we consider Underwood's ineffective assistance of counsel claim with respect to the evidence of a third-party confession.  At the outset, we emphasize this claim's narrow scope on federal habeas review, given the state of the evidentiary record before the MAR court.  Underwood presented no evidence to the MAR court regarding a third-party confession, and, thus, we are precluded from considering the potential evidence that Underwood presented on the subject in support of his federal habeas petition.  See Bell, 236 F.3d at 171 n.13 (affidavit not presented to state habeas court cannot be considered on federal habeas review); N.C. Gen. State. § 15A-1420(b)(1) ("A motion for appropriate relief made after the entry of judgment must be supported by affidavit or other documentary evidence if based upon the existence or occurrence of facts which are not ascertainable from the records and any transcript of the case or which are not within the knowledge of the judge who hears the motion.").  Accordingly, on federal habeas review, we focus solely upon Defense Counsel Whittle's act of telling the jury that someone else had confessed to

killing Gunnarsson (although he mistakenly referred to the victim as Underwood) and then resting the case without presenting any such evidence or mentioning it in their closing statement.

For purposes of our analysis, we will assume, without deciding, that deficient performance occurred. Rather, after independently reviewing the record, we hold that Strickland's prejudice prong is not satisfied, because there is no reasonable probability that, had defense counsel not brought up the confession to the jury during opening statements, the outcome of Underwood's trial would have been different. 466 U.S. at 694. In other words, there is not a reasonable probability that, absent the assumed unprofessional error, "the [jury] would have had a reasonable doubt respecting [Underwood's] guilt." Id. at 695. A review of how the trial unfolded makes this conclusion inescapable.

Over the course of approximately three weeks, the State methodically built its case against Underwood by placing before the jury abundant motive and physical evidence supporting its theory that Underwood murdered both Gunnarson and Miller. With respect to motive, the State presented an abundance of evidence establishing that Underwood was a man who would not take "no" for an answer when Weden made crystal clear to him that she no longer desired to continue their relationship. In addition to

evidence establishing that Underwood sent Weden letters threatening her physical safety during their tumultuous on-again, off-again relationship, the evidence established that Underwood harbored raging jealousy against anyone whom he believed stood in the way of his ability to have a romantic relationship with Weden, including Gunnarsson and Weden's mother, Catherine Miller.

For example, late at night on the same night that Gunnarsson had last been seen alive, Underwood, while on his own date with a different woman, stalked Weden and Gunnarsson in order to learn of Gunnarsson's identity. Underwood indeed learned of Gunnarsson's identity that very night via a license plate check that he had performed on Gunnarsson's vehicle by a law enforcement buddy. And although Underwood had learned of Gunnarsson's identity on the night of December 3, 1993, he falsely told Rowan County Deputy Sheriff Terry Anger twelve days later that he had never heard of Gunnarsson. The evidence also showed that Underwood had ready access to Gunnarsson's address in Underwood's own copy of the Salisbury phonebook.

For a second example of Underwood's raging jealousy, approximately two weeks prior to Gunnarsson's murder, Underwood had confronted Weden and her date for the evening, David Sumner, at a local restaurant. Underwood put his hands on the table and started asking Weden why she had been lying to him. Weden

denied lying about anything and told Underwood that he needed to leave.  At that point, Underwood threatened to kill David Sumner if he did not sit still.  Weden again asked Underwood to leave. At that point, Underwood picked up a glass of tea off of the table, dumped it in Weden's lap, and walked outside.  Once outside, Underwood told the male friend who had accompanied him to the restaurant that he wanted to wait for Weden and her date to exit the restaurant so that he could "hurt [the date] some way or beat him up on the ground or pavement out there."  (J.A. 1743).  The manager of the restaurant called the police.  Once the police officers arrived, they escorted Weden and her date to Weden's car.  Despite knowing that he had caused such a scene that the police had been called, Underwood (with his friend in the car) surreptitiously followed Weden and her date back to Weden's house.  After parking nearby in view of Weden's house, Underwood remained very agitated and angry for approximately thirty minutes, after which time, Underwood's friend who was in the car was able to talk Underwood into driving back to Underwood's residence.

For a third example of Underwood's raging jealousy, Underwood told his buddy Rex Allen Keller on two separate occasions that Weden's mother was "a bitch," because she had interfered with his relationship with Weden to the extent that Miller "was the reason they couldn't get along."  (J.A. 1862).

During the entire summer of 1993, Underwood also successfully persuaded Keller to make between eight and ten anonymous threatening telephone calls to Weden falsely telling her that her son owed him money for drugs, simply for the purpose of harassing her.

The physical evidence obtained by law enforcement overwhelmingly tied Underwood to Gunnarsson's murder. This evidence showed that Gunnarsson had been shot twice in the head with .22 caliber bullets and that Miller had been shot twice in the head with .38 caliber bullets. Underwood possessed a .22 caliber rifle, which a ballistics expert testified could have fired the bullets recovered from Gunnarsson. Moreover, he was issued a .38 caliber Colt Detective Special while formerly serving as a deputy sheriff for Lincoln County. While the inventory records for the Lincoln County Sheriff's Office showed that Underwood had turned in the .38 caliber weapon, the actual weapon could not be located. Also, several witnesses testified that they had seen Underwood in possession of a .38 caliber weapon just prior to the December 1993 murders of Gunnarsson and Miller. The .38 caliber bullets taken from Miller's body were consistent with having been fired by a .38 caliber Colt Detective Special.

An expert in the field of fiber and textile identification testified that his comparison of electrical tape found near

Gunnarsson's body with electrical tape removed from a water line behind Underwood's washing machine at his home revealed the two pieces were consistent in width, thickness, surface texture, and composition of the adhesive. The expert opined that both pieces of tape could have originated from the same roll.

In December 1993 or January 1994, around the same time as the murders, Underwood took his Monte Carlo to a car wash and had it thoroughly cleaned, including having the carpet in the trunk shampooed. The timing and extent of the requested cleaning, especially shampooing the trunk, strongly suggested that Underwood was attempting to eliminate evidence of Gunnarsson's murder. Even with such thorough cleaning, when investigators searched the Monte Carlo on February 1, 1994, "scratches were observed inside the trunk compartment and a mark that resembled a footprint was seen on the underside of the trunk lid." Underwood, 518 S.E.2d at 235. This evidence strongly suggested that a person had been closed in the trunk against his will. And, by far, the most damaging evidence against Underwood consisted of the following: (1) expert witness testimony establishing that the hairs found in the trunk of Underwood's Monte Carlo had the identical microscopic characteristics as a known sample of Gunnarsson's hair and had the same mitochondrial DNA sequencing as a known blood sample of Gunnarsson; and (2) expert witness testimony establishing that

although it is possible for two people to "have the same microscopic characteristics in their hair and the same mitochondrial DNA sequence," such combination "would be highly unlikely," (J.A. 2540).

Notwithstanding this overwhelming evidence, gleaned from numerous and varied sources, that Underwood stalked, kidnapped, and murdered Gunnarsson because he was dating Weden, Underwood now asserts that defense counsel's single reference during opening arguments to a confession by someone else was so prejudicial that there is a reasonable probability that the omission of the remark would have resulted in a different verdict in this case. We are unpersuaded.

Because the State's case against Underwood was so overwhelming, Defense Counsel had little choice but to attempt to chip away at it, which they attempted to do, in particular, by developing and emphasizing the line-up and composite evidence through the State's witnesses. The reference to the third-party confession was made in conjunction with similar references to the line-up and composite sketch evidence during opening statements, and it appears that defense counsel's likely intention at the time was to elicit from the investigating officers, during cross-examination, the fact that Shelton had confessed to various family members and friends that he had killed Gunnarsson. Full realization of this strategy was

thwarted by the State's subsequent motion in limine, granted by the trial judge. Nevertheless, Underwood cannot overcome the fact that, when all was said and done, the State's case against him was iron-clad and overwhelming, and it is clear to us that there is no reasonable probability that, but for Defense Counsel's assumed unprofessional error, the outcome of Underwood's trial would have been different. Strickland, 466 U.S. at 694.

Accordingly, we hold the MAR court's rejection of Underwood's ineffective-assistance-of-counsel claim as it pertained to the unfulfilled promise in opening statement for the defense of a third-party confession was not contrary to or an unreasonable application of the law clearly established in Strickland. See Smith v. Spisak, 130 S. Ct. 676, 685-86 (2010) (assuming without deciding that habeas petitioner was correct that Strickland's deficient performance prong was satisfied, but holding Ohio Supreme Court's rejection of his ineffective-assistance-of-counsel claim was not contrary to or an unreasonable application of the law clearly established in Strickland, because Strickland's prejudice prong not satisfied). Nor was it "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C § 2254(d)(2).

III

Because the MAR court's denial of Underwood's current ineffective assistance of counsel claim as outlined in this opinion survives the deferential review that we owe such denial under 28 U.S.C. § 2254(d), we reverse the district court's grant of habeas relief in this case.

<u>REVERSED</u>